# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 02-2507

GREG LITTLE,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF REVENUE,
ILLINOIS GAMING BOARD, GLEN BOWER,
individually and as Director of the
Illinois Department of Revenue, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 7836—**Charles P. Kocoras**, *Chief Judge.*

_____

ARGUED MARCH 30, 2004—DECIDED MAY 27, 2004

_____

Before POSNER, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Greg Little was (and once again is) a Revenue Special Agent for the Illinois Department of Revenue ("the Department"). He filed a complaint alleging that the Department fired him because of his race and because he spoke out against racial discrimination. Little appeals from the entry of summary judgment regarding his

claims for racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and First Amendment retaliation. We affirm.

## I.

Because this case comes to us after summary judgment, we review the record in the light most favorable to Little, the nonmoving party. *E.g.*, *Rogers v. City of Chicago*, 320 F.3d 748, 750 (7th Cir. 2003). The Department first hired Little as a Revenue Special Agent in 1985. It fired him in 1994 for violating its rules of conduct, but an arbitrator's decision reinstated him in 1996. In 1999, the Department transferred Little to the Illinois Gaming Board ("the Board"), which assigned him to work on the *Empress*, a floating casino. There, Little's job was to enforce the Riverboat Gaming Act, 230 ILCS 10/1, *et seq.* Although Little's place of employment was aboard the *Empress*, he nonetheless remained an employee of the Department and subject to the Department's rules of conduct.

Little had an encounter with Kevin Kickels, the *Empress*'s "Player Development Manager," on July 1, 2000. On July 5, Kickels complained to Little's immediate supervisor, Mark Finn, that Little tried to intimidate him and used profanity during the conversation of July 1. Finn forwarded Kickels' complaint to Sergio Acosta, the Board administrator. Acosta gave the complaint to Joseph Haughey, the Board's deputy administrator, and instructed him to gather preliminary information and refer the matter to the Department's Internal Affairs Division ("IAD") for an investigation.

Chief Inspector Douglas Howard supervised the IAD's investigation of the July 1 incident, which was carried out by Inspectors James Oliver and Carlos Aulet. The inspectors interviewed Kickels and Little twice each, interviewed

several other employees, and examined the security video-tape of the area outside of Little's office that was recorded on July 1. According to the IAD's report, Kickels and Little had conflicting versions of their conversation of July 1.

Kickels maintained that Little had invited him into his office and then confronted Kickels about a personal disagreement that had occurred between Kickels and one of Kickels' employees, Janice Sheard. According to Kickels, Little stated that he was related to Sheard; used profanity; asked if anything was going on between Kickels and Sheard; and accused Kickels of "riding" Sheard. Further, as Kickels related, Little, using foul metaphoric terms,[1] sug-

---

[1] The following quotation of Kickels is taken from the Department's investigative report and puts Kickels' statement in fuller context:

> He then asked me about a situation that happened approximately three months ago when Janice handed me a piece of paper and I asked her if that was her resignation letter. I made this statement after a conversation I had with my supervisor Norma Danner. Norma informed me that Janice was looking for another job and making phone calls on work time to do so. Greg stated that this comment really bothered Janice. I then told him that Janice did discuss this with Chris Corrado and that she never brought it to my attention. He then stated that he saw where I was going with this and that Janice tried to "butt fuck" me by going to Chris first and not discussing the situation with me. I told Greg I was not aware of this until Chris brought it to my attention and asked me to speak with Janice regarding it. He then stated twice that she tried to "butt fuck me" by going to Chris first. I stated to him that I did not appreciate that comment and that this was not the case. He then asked me to tell him that she "butt fucked me"; I told him I would not use that type of statement to

(continued...)

gested that Sheard had attempted to go behind Kickels' back by complaining to his superior, Chris Corrado, that Kickels had asked if she were submitting her resignation. Kickels stated that Little then asked him whether he had "anything against black people," at which point Kickels decided that he had had enough of the conversation and left Little's office. The report further indicates that Kickels denied ever having made any racist remarks in Little's presence.

Little, according the the IAD's report, recounted a very different conversation. As the report characterizes Little's version of events, he and Kickels spoke for "just about 14 seconds," after Kickels had approached him to apologize for a racist remark that Little had overheard Kickels make about one-and-a-half months earlier. As the report relates Little's version of events, Little told Kickels that his racial proclivities were not Little's concern and abruptly terminated the conversation.

The IAD's report also related that the surveillance video of the area outside of Little's office showed Kickels and Little entering the office at 10:22 p.m. and leaving at 10:36. According to the report, Sheard and *Empress* employees Allison Dwyer, Norma Danner, and Chris Corrado also provided ancillary information related to the incident on

---

(...continued)

describe the incident. He stated that we were just a couple of guys and that I could say that to him. He also told me that he didn't want to have to bring this to Chris or Dave's attention. I told him that if he felt that was necessary he was free to do so. After that comment, he said that if he wanted to go after my character he didn't have to go to Chris or David, he would take me straight to the Illinois Gaming Board. Obviously, I felt that this was a serious threat and was very disturbed by this comment.

July 1. Sheard stated that she had no problem with Kickels, and that she never spoke to Little about any problem with Kickels. Dwyer stated that Little had told her that he had confronted Kickels about problems with Sheard. Danner said that Little had expressed an interest in Sheard and other female employees of the *Empress*. Corrado told investigators that Kickels had approached him shortly after July 1 and asked how to handle his discussion with Little.

The conclusion of the IAD's report, which was signed by Aulet and Howard, was that Kickels was telling the truth, and Little was lying, about the conversation on July 1. The report also concluded that Little did not fully cooperate with the investigation, because he had declined to sign a waiver form and because he refused to answer questions about the discrepancy between the surveillance tape showing that Kickels was in his office with Little for 14 minutes and his recollection that the conversation only lasted several seconds. The report also concluded that Little put forth no evidence in support of his story. After reviewing the IAD's report, Robert Tapscott, the Department's program administrator for administrative services, conferred with various supervisors and then recommended to Glen Bower, the Department's director, that Little be fired. After reviewing the report and consulting with various subordinates, Bower then made the decision to discharge Little, effective December 21.[2]

---

[2] According to Bower's affidavit, Bower merely "recommended to the Illinois Department of Central Management Services ('CMS') that Little be discharged." Little nonetheless points to the parties' Local Rule 56.1(b) statements of fact in support of his assertion that it was Bower, and not CMS, who effectively "made the final decision to terminate Plaintiff." The record could

(continued...)

Little, whose contract was covered by a collective bar-gaining agreement, almost immediately brought a grievance against his discharge and wrote letters to Bower and to an assistant to Illinois' governor, complaining of racial discrim-ination in the Department. The arbitrator concluded that Little had improperly interjected himself into the *Empress*'s personnel matters, had used improper language in his conversation with Kickels, and was untruthful during the IAD's investigation. The arbitrator also decided, however, that Little was not as uncooperative as the report indicated and that, in light of his fifteen years of service to the Depart-ment, Little should not have been fired. The arbitrator ordered Little reinstated, effective November 18, 2001. Given Little's degree of culpability, however, the arbitrator declined to award back pay or benefits.

Little then sued the Department, the Board, Bower, Haughey, and Tapscott in the district court. Little com-plained that his discharge was because of his race, which would have violated Title VII, and because he had spoken out against discrimination, which would have constituted retaliation in violation of both Title VII and the First Amendment. The district court granted summary judgment to the defendants in all respects.

## II.

We review the district court's grant of summary judgment de novo, construing all facts in favor of Little, the nonmoving party. *Rogers*, 320 F.3d at 752. Summary judg-ment is appropriate when the "pleadings, depositions, an-

---

(...continued)
reasonably be construed to support that conclusion and so, for our purposes, Bower was the decisionmaker who fired Little.

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, summary judgment is warranted where "a rational trier of fact could not find for the non-moving party." *Rogers*, 320 F.3d at 752.

Title VII forbids certain employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" his race. 42 U.S.C. § 2000e-2(a)(1) (2000). Its anti-retaliation provision also forbids those same employers from taking an adverse employment action against an employee for opposing impermissible discrimination. 42 U.S.C. § 2000e-3(a). There is no dispute that the Department is an employer subject to Title VII. The other defendants did not employ Little and cannot, of course, be liable under that statute. *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 885 n.4 (7th Cir. 1998).

Little may prove intentional discrimination in violation of Title VII under the direct or indirect method. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Before the district court, Little attempted to prove both racial discrimination and retaliation in violation of Title VII solely under the indirect method, arguing that he stated a prima facie case of both claims and that he had shown that the nondiscriminatory justification put forth by the Department was pretextual. He is thus foreclosed from invoking the direct method on appeal. *Buie v. Quad/Graphics, Inc.*, ___ F.3d___, 2004 WL 885726, at *6 (7th Cir. Apr. 27, 2004).

Under the indirect method of proving racial discrimination, Little must first establish a prima facie case. *Rhodes*, 359 F.3d at 504. He must show that (1) he was a member of a

protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably. *Id.* If Little were to clear that hurdle, the Department would have to articulate a nondiscriminatory reason for firing him, and in response Little would have to put forth competent evidence that the proffered nondiscriminatory reason was a pretext for unlawful discrimination. *Id.*

Similarly, to prevail on his claim for Title VII retaliation under the indirect method, Little must establish a prima facie case that the employer subjected him, and not any similarly situated employee who did not oppose impermissible discrimination, to an adverse employment action even though he was performing his job satisfactorily. *Rogers*, 320 F.3d at 754. If Little were to put forth a prima facie case, the Department would have to articulate a nondiscriminatory reason for firing him, and in response Little would have to produce competent evidence that the proffered nondiscriminatory reason was a pretext for retaliation. *Id.* at 755.

The district court granted summary judgment as to Little's Title VII claims because he had not established a prima facie case of racial discrimination or retaliation and because he had not rebutted the Department's evidence that a nondiscriminatory reason motivated Bower's decision to discharge Little. We agree with the district court on both points.

As noted above, to put forth a prima facie case of either racial discrimination or retaliation, Little must show, among other things, that he was treated differently than a similarly-situated employee who was not in the protected class. A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff. *Patton v. Indianapolis*

*Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). Little argues that several employees who engaged in misconduct comparable to his alleged misbehavior were less severely punished. Little points to no evidence, however, that any of these persons were disciplined, or not, by the same decisionmaker who made the adverse employment decision in his case, Bower. The discipline that those employees may, or may not, have received therefore sheds no light on the decision to discharge Little. *See id.; Buie*, 2004 WL 885726, at *8. Because Little has not put forth competent evidence that he was treated differently than a similarly situated employee outside of either of his protected classes, he has failed to establish a prima facie case and summary judgment was proper for that reason alone. *Rogers*, 320 F.3d at 753-54.

Summary judgment was also appropriate because Little lacks sufficient evidence of pretext. The only adverse employment action that Little identifies is his discharge. The nondiscriminatory reason that the defendants put forth for Little's termination was that the decisionmaker, Bower, believed the conclusions of the IAD's report regarding Little's nefarious conduct. Little attempts to establish that this reason was a pretext for discrimination.

Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination. *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). This circuit adheres to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist. *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001); *Crim v. Board of Educ.*, 147 F.3d 535, 541 (7th

Cir. 1998); *Bechold v. IGW Sys., Inc.*, 817 F.2d 1282, 1285 (7th Cir. 1987).[3]

Bower made the decision in question. Thus, to show pretext, Little must establish that Bower's professed reason for that decision—that the IAD's report established that Little had behaved badly—was a lie. *See Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876-77 (7th Cir. 2002); *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989) (stating that "[i]t is the perception of the decision maker which is relevant" to the analysis of pretext). Little attempts to do this first by stating that the conclusions and findings of the IAD's report were contradictory and inconsistent. He then argues that Bower "was aware of the numerous contradictions in the IAD report. Bower knew that questions had been raised about the integrity and credibility of Oliver. Bower also knew that Plaintiff had made several complaints of discrimination to Bower regarding his pattern of disciplining black employees more severely than white employees."

---

[3] The Sixth Circuit, relying on legislative history, has rejected the honest-belief rule and required employers to show that the employer's nondiscriminatory reason not only is honest but also is "reasonably based on particularized facts." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citing 136 Cong. Rec. S 7422-03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin)). We, however, have declined to follow this approach. *See Flores v. Preferred Tech. Group*, 182 F.3d 512, 516 (7th Cir. 1999). The indirect method is, after all, a means of proving *intentional* discrimination. Where the employment action is grounded in an honest and permissible reason, there can be no intent to discriminate unlawfully—even if that reason is not reasonably based on particularized facts. Rebecca Michaels, *Legitimate Reasons for Firing: Must They Honestly Be Reasonable?*, 71 Fordham L. Rev. 2643, 2667 (2003).

It is not entirely clear how we should treat this argument. At first blush, it appears that Little contends that the IAD's investigation was so shoddy as to give rise to an inference of discriminatory intent. That argument, however, would be a nonstarter. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997) (rejecting the plaintiff's argument that he could show pretext by establishing that the employer engaged in an impulsive, shoddy investigation).

Construed more liberally, Little's argument may be that he could show pretext by proving that Bower's professed reliance on the IAD's report was so unreasonable as to create the inference that Bower subjectively did not believe the report's conclusions. We have stated that, "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." *Flores*, 182 F.3d at 516. Conversely, it is also true that, the more objectively *un*reasonable a belief is, the more likely it will seem that the decisionmaker did *not* actually hold it. *See Bechold*, 817 F.2d at 1285.

Little, however, does not put forth competent evidence that Bower's belief in the conclusions of the IAD's report was so incredible as to allow a jury to conclude that he did not really put credence in the report. As for the "numerous contradictions" that Little apprehends in the report, the first and most substantial concerns the report's conclusion that Little refused to answer questions about the discrepancy between his statement that the July 1 conversation lasted a few seconds and the evidence from the surveillance video that it lasted about 14 minutes. That discrepancy, if unexplained, would have eviscerated Little's version of events, which hinged on his assertion that his conversation with

Kickels was very brief. Here is the part of the transcript upon which the report's conclusion is based.[4]

Q:  When was the next time that you and Kevin Kickels had a conversation.

A:  I don't recall the date. He came to me while I was in the concierge and asked me if I had an office. I said yes. He (Kickels) said can I see it. I took him to my office on the boat we spoke very, very briefly. He (Kickels) said, "I didn't mean it." I said your proclivities don't concern me. And I left my office.

Q:  Was this meeting on July 1st, 2000.

A:  I don't recall.

Q:  All total, how much time were you together in your office?

A:  "It was very, very brief. I can't be around that bigot, just about 14 seconds."

Q:  Do you recall having a conversation with Kickels on July 1st, 2000.

A:  I don't recall at all.

Q:  You don't recall at all?

A:  I don't recall.

[At this point, the investigators played the surveillance tape showing that Little and Kickels were in Little's office for about 14 minutes on July 1 and then resumed questioning.]

Q:  Do you recognize the people in this video?

A:  Yes that's Kevin Kickels and me in front of him going into my office.

---

[4]  There are too many errors of punctuation in this part of the transcript to make it worthwhile to insert "sic" by each one.

Q:   Can you see that this was recorded on July 1st 2000 and that it reveals you and Mr. Kickels entered your office at approximately 10:22 PM and exited at 10:36 PM. That you and Kickels were together approximately 15 minutes?

A:  Yes.

Q:  Tell me about your conversation with Kickels during this time.

A:  *I have nothing to say.* [emphasis added]

Q:  Agent Little, I must remind you, as you originally were admonished of the Administrative Proceeding Rights, you are obliged to answer completely and truthfully. You can not refuse to answer any question."

A:  "I don't have anything to say about this. I'm not going to talk about this."

Q:  You're not going to talk about this?

A:  "I refuse to answer." "You draw your own conclusions."

Q:  If you're going to refuse to answer questions then we will have to end this interview.

A:  Then this interview is over.

Based on this portion of the interview transcript, the IAD's report concluded that Little had refused to answer questions during the investigation. The arbitrator disagreed, reasoning that Little's reticence was "more a refusal to confess than a refusal to answer questions. This is so because the grievant did, several times, answer questions about the length of the meeting claiming that it was brief but would not admit that it was 15 minutes." Little seizes on this part of the arbitrator's analysis to argue that a jury could find incredible Bower's professed belief that, as per

the IAD's report, Little had refused to answer questions about the discrepancy between his statement that any conversation with Kickels was very brief and the videotape showing that the conversation was really about 14 minutes.

We disagree. The transcript speaks for itself. Notwithstanding the arbitrator's contrary conclusion, once Little was confronted with the videotape, he very plainly did refuse to explain why there was such a startling contrast between his recollection of events and reality as captured on camera. On the basis of this evidence, a reasonable jury could not conclude that Bower did not honestly believe the report's conclusion that Little refused to answer questions about this subject.

Little also claims that, contrary to the IAD's report, Dwyer and Corrado did not actually corroborate Kickels' version of the July 1 conversation. As noted above, Dwyer told investigators that Little had told her that he had confronted Kickels about problems with Sheard, and Corrado related to investigators that Kickels had approached him shortly after July 1 and asked how to handle his discussion with Little. Nothing in either of their statements was inconsistent with the report's conclusions and, therefore, nothing that either Dwyer or Corrado told investigators allows the reasonable inference that Bower did not believe the report's accuracy. Little further asserts that Sheard had stated that she never told Little about any friction that she had with Kickels, and that the report contains no evidence as to how Little would have become aware of a disagreement between Kickels and Sheard. This observation is true, but would not allow a jury to infer that Bower did not believe the IAD's report. That report, after all, contained ample evidence showing that, regardless of why Little thought that Kickels had a problem with Sheard, he had confronted Kickels on July 1, in the crudest terms, about his relationship with Sheard.

In his opening brief, Little also asserts that Bower's reliance on the report was incredible because "Bower knew that questions had been raised about the integrity and credibility of Oliver. Bower also knew that Plaintiff had made several complaints of discrimination to Bower regarding his pattern of disciplining black employees more severely than white employees." The "questions" raised about Oliver's integrity concerned an alleged earlier incident of "double dipping" while both the Secretary of State and the Chicago Police Department employed Oliver. This argument gets Little nowhere. Evidence that people may have *accused* Oliver of wrongdoing—either in regard to "double dipping" or as to Oliver's treatment of black employees (Oliver, for what it is worth, is himself black)—would not by itself allow a jury to infer that Oliver's integrity was so compromised that Bower's professed belief in the IAD's report was rendered unbelievable. This is especially true considering that Oliver was only one of the investigators involved in preparing the report and that Oliver had not even signed off on the conclusion.

Construing Little's opening brief liberally, it also appears that Little points to evidence that, in his view, would allow a jury to conclude that Haughey and Tapscott did not honestly believe the IAD's report. Because Little neither argues, nor points to evidence showing, that either Haughey or Tapscott was a decisionmaker, whether they honestly believed the IAD's report is irrelevant to the issue of pretext. The analysis of pretext focuses only on what the decisionmaker, and not anyone else, sincerely believed. *See Buie*, 2004 WL 885726, at *5; *Krchnavy*, 294 F.3d at 876-77; *Weihaupt*, 874 F.2d 428; *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 298 (4th Cir. 2004) (en banc) (holding that there was no issue of fact as to pretext where the plaintiff could not show that any decisionmaker acted pretextually).

Of course, the beliefs of Haughey and Tapscott are not irrelevant simply because they were not *formal* decision-makers. Even someone who merely recommends a termination is considered a decisionmaker for purposes of assessing pretext when he was the one functionally, if not formally, responsible for the decision. *See Rogers*, 320 F.3d at 754 (stating that "[a] decisionmaker is the person responsible for the contested decision"); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997) (reasoning that a formally subordinate employee should be treated as the decisionmaker where he "is the real cause of the adverse employment action"); *see also Hill*, 354 F.3d at 291 (holding that a decisionmaker is "the one principally responsible for the decision or the actual decisionmaker for the employer"); *cf. Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 85-86 (1st Cir. 2004) (reasoning that there can be employer liability where a low-level, age-biased employee dupes his unbiased superiors into unwittingly committing an act of age discrimination). Little, however, neither identifies Haughey or Tapscott as a decisionmaker, nor does he point to evidence showing that either man was either formally or functionally responsible for the decision to fire him. Whether Haughey or Tapscott honestly believed the IAD's report, accordingly, is irrelevant to the issue of pretext.

In short, Little's claims under Title VII fail because Bower is the decisionmaker who fired him, and Little puts forth no evidence that would enable a reasonable jury to think that the nondiscriminatory reason Bower offered for that discharge was a lie contrived to mask racial discrimination. Summary judgment was thus entered properly against his claims under Title VII.

The same logic dooms Little's claim for First Amendment retaliation. As was true under Title VII, to reach a jury with a theory of First Amendment retaliation, Little must

show that a reasonable jury could conclude that the Department's stated, legitimate reason for his termination was a lie. *Vukadinovich v. Board of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002). He has not done so, and summary judgment on his First Amendment claim was therefore proper.

## III.

Before the district court, Little proceeded solely under the indirect method of proving racial discrimination and retaliation in violation of Title VII. His failure to point to a similarly situated employee who was both outside of either of his protected classes and who engaged in comparably serious conduct prevents him from establishing a prima facie case of either claim. Moreover, because the Department put forth a legitimate reason for Little's termination, Little had to point to evidence from which a reasonable jury could conclude that this reason was pretextual. Little failed to do so, which means that summary judgment was appropriate as to his claims under Title VII. The same logic dooms his claim for First Amendment retaliation, because Little cannot show that, but for his protected speech, he would not have been fired.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*