# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2802

GARY HERRON,

*Plaintiff-Appellant*,

v.

DAIMLERCHRYSLER CORPORATION,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 00 C 1838—**Sara Evans Barker**, *Judge.*

_____

ARGUED SEPTEMBER 28, 2004—DECIDED NOVEMBER 3, 2004

_____

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Gary Herron sued his former
employer, DaimlerChrysler Corporation ("Daimler-
Chrysler") under Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1981, alleging race
discrimination, retaliation, racial harassment, and construc-
tive discharge. The district court granted Daimler Chrysler's
motion for summary judgment. We affirm.

## Background

Gary Herron, who is black, began working at Daimler-Chrysler's Kokomo, Indiana transmission plant ("KTP") in 1994. After a few months, he announced his intention to accept a supervisory position with a different employer. In order to keep Herron, DaimlerChrysler countered with an offer of a supervisory position at KTP, which Herron accepted. In his new position, Herron was responsible for the manufacture of transmission parts used on KTP's assembly line.

While Herron performed well in terms of producing parts, he had considerable difficulty interacting with subordinates, peers, and superiors. In 1996, Herron had two major incidents resulting in disciplinary action by DaimlerChrysler. First, Herron ignored instructions from his area manager (the position overseeing supervisors such as Herron) and yelled at him in March 1996. At a meeting to address this incident, Herron was informed that the union had also complained about him. According to a memorandum by KTP's labor relations supervisor, Herron was arrogant, disrespectful, and defensive when discussing these issues.

In May 1996, Herron was again disciplined. Ron Abney, Herron's area manager, informed Herron of complaints by subordinates of rude and unprofessional behavior. Herron then had a meeting with Abney, the labor relations supervisor, and Bill Schaefer, one of KTP's manufacturing managers (a supervisory position above area manager). The labor relations supervisor noted that during this meeting Herron was again disrespectful, refusing to listen and interrupting his superiors. Subsequently, Herron was placed on a paid leave of absence, and Schaefer recommended Herron's removal from any supervisory position. Schaefer informed the Complex Personnel Manager that Herron "does not recognize his responsibility for respect of authority for his

supervisor. He also displays no consideration for positive working relationships with co-workers." Herron avoided demotion, however, and only received a written reprimand in early June 1996 and placement in a 30/60/90-day performance improvement program. As part of this program, Herron had to improve his performance, which Abney monitored in 30-day periods. Herron successfully completed this program.

Despite his brushes with the disciplinary process, Herron's behavioral problems resurfaced in 1997 and 1998. He was placed on a five-day disciplinary layoff after a January 1997 confrontation during which he was disrespectful to an area manager named Ed Wallace. In July 1998, a supervisor in another department told Herron not to ship certain parts, as the parts were being inspected. Herron ignored this request and shipped the parts before the inspection could be completed. The inspection showed that the parts were subpar and should not have been shipped. When Wallace attempted to talk to Herron about his disregard of the other supervisor's request, Herron refused to listen, argued, and walked off angrily.

These persistent, significant problems with his treatment of co-workers, superiors, and subordinates obscured Herron's continued good production. Herron never failed to meet his daily production goal in 1998. One of Herron's area managers, Richard Huffman, noted that Herron carried the department for him the first six months of the year with his excellent production of parts. Huffman later elaborated on his feelings toward Herron.

> Now Gary is headstrong and has a short temper. Gary is the type that when you have a discussion with him it escalates quickly . . . He doesn't get along with people. He is argumentative, not a team player, a lone wolf, not a [sic] but kisser, but would do what he was told.

Herron's 1998 appraisal reflected this mixed performance. The DaimlerChrysler appraisal report is made up of several sections. First is an overall Assessment of Results, which notes generally how the employee performed. In this section, an employee is graded (from highest to lowest) either Role Model, Significant Contributor, Contributor, or Development Needed. The appraisal itself does not specify what considerations go into this Assessment. The appraisal also contains a section specifically devoted to a variety of behavior ratings (from the employee's supervisor), a section for supervisor comments, and a section for employee comments. Huffman originally recommended Herron for Significant Contributor in the overall Assessment and gave him behavior ratings averaging a 2.9 out of 4. Schaefer, placing emphasis on Herron's interpersonal problems, asked that Huffman reduce the overall Assessment to the lower Contributor level, and Huffman agreed. Huffman reviewed four other supervisors. The two white supervisors received Significant Contributor rankings, with one supervisor receiving a behavior rating of 2.9 and the other receiving a 2.7. The two remaining supervisors, who were minorities, were ranked Contributors, with behavior ratings of 2.9. Huffman submitted Herron's revised evaluation with the Contributor rating on or before December 7, 1998, when a computer processing center recorded it.

In December 1998, Larry Hall succeeded Schaefer as manufacturing manager. Hall, who is also black, attempted to mentor Herron. Feeling that Herron was having trouble with his area manager, Hall inquired of the other area managers at the plant whether anyone would take Herron. Every manager, whether black or white, refused.

Herron's attitude problems continued in 1999. In January, area manager Mark Carie attempted to talk to him about attendance issues. Herron interrupted and became belligerent.

The next day Herron met with Carie and Hall, who issued a discipline known as a Statement A for Herron's belligerence. Herron refused to sign the discipline and left the plant, though Hall indicated that Herron did not have permission to leave. Herron subsequently claimed that he went on sick leave and saw a doctor during his two-day absence. Herron was not paid for his time away from the plant, as the Personnel Administrator determined his actions were arbitrary and defiant. Shortly thereafter, Herron was transferred. Between February 1999 and April 2000, Herron was transferred between departments three times, and Herron's shift assignments changed four times.

At the end of the January 1999 meeting, Herron requested to talk to Workforce Diversity, an independent Daimler-Chrysler group established to investigate discrimination complaints. He spoke with Marvin Moore, who informed Herron that he would come to KTP on February 8 to conduct an on-site investigation of Herron's complaints. Moore interviewed several employees during this investigation, including Schaefer and Herron, while Hall was interviewed by another member of Workforce Diversity. Both Schaefer and Hall explained that a good supervisor did not just make parts and that Herron had problems with another crucial aspect of his position—his ability to interact with his fellow supervisors and subordinates. Hall further noted that Herron had developed a reputation as someone who was difficult to work with and that no area managers wanted to work with him. Moore determined there was no discrimination.

Herron continued his pattern of solid production work and poor behavior as 1999 progressed. In August 1999, Herron had problems with another supervisor, and an area manager, Harry Morrow, disciplined him. In October and November 1999, Herron's then area manager, Bentley Craig, complained about Herron's attitude and behavior towards

him. Craig and Morrow gave Herron a Development Needed rating, the lowest rating possible, in the overall Assessment section of his 1999 appraisal. Hall approved this rating at a next level review meeting on November 6, 1999. In December 1999, Herron received another Statement A discipline for failing to provide information for his self-appraisal. On December 14, 1999, Herron contacted Michele Cook at Workforce Diversity with renewed complaints of discrimination and harassment. After an investigation, she concluded there had been no discrimination.

Herron filed two EEOC complaints charging discrimination and retaliation in February and April 2000. On April 11, 2000, he received his 1999 appraisal with the Development Needed rating. He was again placed on a 30/60/90 review to improve his behavior and performance. On June 6, 2000, after securing employment with Rolls Royce at a similar wage and position, Herron resigned his position at Daimler-Chrysler.

Herron then brought suit against DaimlerChrysler in the Southern District of Indiana. He alleged race discrimination and retaliation against him by DaimlerChrysler. Herron further asserted that DaimlerChrysler's actions constituted a campaign of racial harassment that created a hostile work environment and led to his constructive discharge. Daimler-Chrysler moved for summary judgment, which the district court granted. Herron appeals.

## I.

We review the district court's grant of summary judgment de novo, construing all facts in favor of Herron, the nonmoving party. *See Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogato-

ries, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, summary judgment is warranted where "a rational trier of fact could not find for the non-moving party." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).

Herron makes claims of race discrimination, retaliation, and racial harassment under Title VII and 42 U.S.C. § 1981. Because we evaluate § 1981 claims under the same rubric as Title VII claims, we need not address them separately. *See Williams*, 361 F.3d at 1028. As DaimlerChrysler presents challenges to Herron's constructive discharge claim specific to each of the statutes, we will address these claims separately.

## A. Race Discrimination

Herron first claims that DaimlerChrysler committed race discrimination in four different instances: (1) a two-month delay by DaimlerChrysler in the payment of certain overtime; (2) Herron's status as one of KTP's lower-paid supervisors; (3) Herron's physical illness caused by the stress of the alleged discrimination; and (4) the automatic denial of a pay raise based on Herron's negative 1999 appraisal. As Herron never argued the first three of these as part of his racial discrimination claim before the district court, however, he is barred from raising them now. *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1033 (7th Cir. 1998). Herron's final claim, which relates to the 1999 appraisal and denial of the pay raise, remains.

While Herron may prove intentional discrimination in violation of Title VII under either the direct or indirect

method, *see Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004), he chooses to proceed using only the indirect method of proof.

The indirect method relies on the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case, Herron must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) DaimlerChrysler took an adverse employment action against him; and (4) his employer treated similarly situated individuals outside of the protected class more favorably. *See, e.g.*, *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). If Herron meets this burden, Daimler-Chrysler must articulate a legitimate, nondiscriminatory reason for its actions. *Little*, 369 F.3d at 1011. If Daimler-Chrysler were able to point to such a reason, the burden remains with Herron to show that the reason put forth was not a true reason, but a pretext—"a dishonest explanation, a lie rather than an oddity or an error." *Peters*, 307 F.3d at 545 (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). In this case, however, Herron does not advance to the later stages of the analysis, as he cannot show a prima facie case of discrimination.

Before turning to Herron's prima facie case, a brief comment on the structure of Herron's argument. Once again, a plaintiff has put "the pretext cart before the prima facie horse." *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). Herron analyzes only one prong of the indirect method, the employer's allegedly adverse employment actions, before jumping to pretext. This is not correct. "We have frequently warned litigants that the prima facie case must be established and not merely incanted." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). The plaintiff must meet each prong of the prima facie test before reaching pre-

text. *Brummett*, 284 F.3d at 744. While merger of the legitimate expectations requirement with the pretext analysis is acceptable in limited circumstances, the obligation to establish a prima facie case should not be disregarded as a matter of course.

We turn then to the question of whether Herron has established a prima facie case of race discrimination. Herron is clearly a member of a protected class. DaimlerChrysler also acknowledges that for the "purposes of summary judgment" the negative 1999 evaluation, which resulted in the automatic denial of a pay raise, constitutes a materially adverse employment action.[1]

Herron's prima facie case quickly unravels, however, because he failed to show that he was meeting DaimlerChrysler's legitimate expectations at the time of the 1999 evaluation. DaimlerChrysler argued, without opposition from Herron, that it measured a successful supervisor not simply by success in producing parts, but also by his ability to interact with his subordinates, peers, and supervisors. Herron had a long history of volatile relations with each of these groups. Beginning in 1996, he was frequently being disciplined at varying levels of severity for his persistent behavior and attitude problems. In 1999 alone, he received two Statement A disciplines, he had to attend a meeting with Manufacturing Manager Larry Hall because of behavior problems, and he engaged in multiple altercations with area

---

[1] An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). However, a negative performance evaluation is usually not labeled an adverse employment action. *See, e.g.*, *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001).

managers, including Carie, Morrow, and Craig. Herron's ability to point to a few co-workers who tolerated his attitude is not sufficient to show that he met DaimlerChrysler's legitimate expectations. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("that plaintiff's coworkers 'may have thought that [she] did a good job . . . is close to irrelevant.' "). Herron's disrespectful and argumentative nature was continually on display at KTP. DaimlerChrysler clearly enunciated a desire to have supervisors who could successfully deal with subordinates, peers, and supervisors, and Herron did not meet this expectation.

Herron also failed to establish that a similarly situated employee was treated more favorably. To succeed, Herron first must show an employee who is similarly situated, demonstrating "that there is someone who is directly comparable to him in all material aspects." *Grayson*, 308 F.3d at 819. Herron does not make this initial showing. He points to the higher marks of white supervisors in the 1998 appraisal, but this is completely irrelevant. First, only the 1999 appraisal (with the denial of the pay raise), not the 1998 appraisal, is at issue. Evidence of how other supervisors were graded in 1998 has no real bearing on an analysis of whether one was treated more favorably in 1999.

Second, even if the 1998 appraisal did have some relevance for 1999, Herron does not show that the other supervisors were similar in all material aspects to him. When making this determination, we must look at all relevant factors, which depend on the context of the particular case. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Herron did not present any evidence of other supervisors who engaged in similar interpersonal conduct but who were not subjected to the same disciplinary measures. Without such evidence, the other supervisors cannot be considered similarly situated.

Because Herron fails to demonstrate either that he met his employer's legitimate expectations or that a similarly situated employee was treated more favorably, he has failed to establish a prima facie case of race discrimination. However, even if he had established a prima facie case, he would still lose. DaimlerChrysler presented a non-discriminatory reason for Herron's negative evaluation, namely his volatile behavior and poor attitude, and Herron failed to show pretext. Accordingly, the district court correctly granted summary judgment on Herron's race discrimination claims.

## B. Retaliation

We next consider Herron's retaliation claim. Herron claims that DaimlerChrysler retaliated in various ways after he complained in 1999 to Workforce Diversity and in 2000 to the EEOC.

Herron chose to proceed before this court using the direct method of proving retaliation under Title VII and Section 1981. Under this method, Herron must show: (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two. *Davis v. Con-Way Transportation Central Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004).

Turning first to the claimed 1999 retaliation, Daimler-Chrysler does not challenge that Herron's complaint to Workforce Diversity was a protected activity, but claims that Herron failed to present evidence of an adverse action. Herron points to several alleged adverse employment actions: (1) a two-month delay by DaimlerChrysler in the payment of certain overtime; (2) his transfers between various departments and shifts; (3) DaimlerChrysler's refusal to pay him for his absence on January 13-14, 1999; and (4) Schaefer's reduction of Herron's rating in the 1998 evaluation to the Contributor level.

To demonstrate an adverse employment action, "an employee must be able to show a quantitative or qualitative change in the terms or conditions of employment." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). The first three allegations are minor annoyances, not matters which typically involve adverse employment actions. A short delay in overtime payment is an inconvenience, as are transfers without any reduction in pay or status. *See id.* ("mere unhappiness and inconvenience are not actionable under Title VII"); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2004) ("job transfers . . . *that lead to significantly diminished responsibilities and substantially changed working conditions* can be retaliatory actions") (emphasis added). Further, Daimler-Chrysler's refusal to pay Herron for his brief absence in January 1999 when he left after a verbal confrontation with his supervisors did not constitute an adverse employment action. This non-payment during his disputed absence did not work a quantitative or qualitative change in the conditions of his employment. *See Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (refusal to reimburse expenses for unapproved, but work-related, seminar was not a materially adverse action); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (in Title VII race discrimination context, the loss of one day of wages was not substantial enough to qualify as an adverse employment action).

Herron's remaining claim, relating to Schaefer's reduction of his 1998 appraisal rating, fails under the causal connection prong of the analysis. Herron asserts that his 1998 appraisal was lowered in response to January 1999 complaints to Workforce Diversity. This is a non-starter, as unchallenged company records indicated that his appraisal was lowered to the Contributor level as of December 7, 1998, more than a month before any complaints. "It is axiomatic that a plaintiff engage in statutorily protected activity before an employer

can retaliate against her for engaging in statutorily protected activity." *Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003).

Herron's claim of retaliation relating to the 2000 EEOC complaints also runs aground on causal connection. Herron claims that he received a Development Needed rating in his 1999 appraisal in response to his February and April of 2000 EEOC complaints. Undisputed KTP records, however, show that Morrow and Craig completed the appraisal and Hall approved it by November 6, 1999. As the appraisal came well before the complaints, the EEOC complaints could not have resulted in the supposed retaliation. Herron cannot establish retaliation under Title VII, and the district court properly granted DaimlerChrysler summary judgment on this claim.

## C. Racial Harassment

Herron next contends that he suffered racial harassment due to the hostile work environment at KTP. To succeed on his racial harassment claim, Herron has to show that: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). Further, Herron must establish that the objectionable environment was both subjectively and objectively offensive. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "Another method of framing this issue, as we have done in some of our opinions, is to ask whether the harassing words or conduct were 'severe *or* pervasive,' although the substance of the inquiry is the same either way." *Hrobowski*, 358 F.3d at 476.

Herron builds his hostile work environment claim largely on the same allegations that powered his racial discrimination and retaliation claims. However, Herron offers no evidence that the alleged harassment was based on his race. In his brief before this court, Herron merely states that, while he suffered from a campaign of racial harassment, "this is not the classic racial harassment case . . . ." That is true, but not in the way that Herron meant it; this case involves no racial component at all. Herron points to a number of problems he experienced at KTP and suggests they were racially based because white supervisors did not have the same problems. Herron does not show any connection between these occurrences and his race. His problems were not related to his race—they were related to him. The fact that he is a member of a protected class does not transform them. This alone dooms his racial harassment claim.

Moreover, the allegations simply do not rise to actionable harassment. When deciding whether a hostile environment exists for racial harassment purposes, this court must evaluate the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Herron's allegations do not place him in any of the multiple levels of workplace trauma that would establish actionable harassment. *See Rogers*, 320 F.3d at 752 (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1994)) ("the workplace that is actionable is the one that is hellish"). Here he complains about transfers, a late overtime payment, his salary, and difficulties with managers. This is normal workplace friction. Objectively, the treatment Herron "suffered" at KTP was neither severe nor pervasive enough to constitute harassment interfering with his work performance.

### D. Constructive Discharge

Herron's final claim is that he suffered a constructive discharge.[2] In order to show that a hostile work environment resulted in a constructive discharge, Herron "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that [his] resignation was an appropriate response." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). The "working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *Id.*; *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (quoting *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)). Herron was obviously not pleased with his situation at DaimlerChrysler, but he left voluntarily several months after filing his last EEOC complaint and after having secured a comparable job elsewhere. Because Herron failed to establish a hostile work environment, his claim for constructive discharge also must fail. Therefore,

---

[2] Before turning to the substance of this claim, we note that Herron may only proceed on his claim under § 1981. Under Title VII, a plaintiff must file an EEOC complaint before proceeding with a federal case and can only pursue those claims "like or reasonably related to" the allegations contained in the charge. *See Peters*, 307 F.3d at 550. Herron's EEOC charges in February and April 2000 described racial discrimination, retaliation, and harassment, not constructive discharge. As the district court found, the four-month delay between his February EEOC complaint and his decision to leave was inconsistent with notice of constructive discharge. Since the charges contained in the EEOC complaint were not "like or reasonably related to" his EEOC allegations, Herron cannot proceed under Title VII on a constructive discharge claim.

the district court properly granted DaimlerChrysler summary judgment on this claim as well.

### CONCLUSION

Gary Herron was an employee who was able to do some aspects of his job quite well. Unfortunately, he also was an employee whose interaction with his subordinates, peers, and supervisors was unacceptable. It was Herron's confrontational and disrespectful attitude, and not his race, that created his problems at DaimlerChrysler. Because Herron failed to present sufficient evidence of race discrimination, retaliation, race harassment, or constructive discharge, the district court properly granted DaimlerChrysler summary judgment. For these and the foregoing reasons, we AFFIRM.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*