In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2200

MARCELLA FANE,

*Plaintiff-Appellant,*

*v.*

LOCKE REYNOLDS, LLP,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:04-CV-01010—**John Daniel Tinder**, *Judge.*

ARGUED JANUARY 5, 2007—DECIDED MARCH 14, 2007

Before FLAUM, MANION, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* From July 2001 until August 2003, Marcella Fane worked as a paralegal at Locke Reynolds, LLP. After she was terminated, Fane filed suit against Locke Reynolds, alleging racial discrimination in relation to her pay, workload, and termination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 as well as 42 U.S.C. § 1981. Finding that Fane had failed to establish a prima facie case of discrimination, the district court granted summary judgment in favor of Locke Reynolds, and Fane appeals. For the following reasons, we affirm.

**I. BACKGROUND**

Locke Reynolds hired Fane as a paralegal in its toxic tort/asbestos practice group ("asbestos practice group") on July 9, 2001.[1] She continued in that position until Locke Reynolds terminated her employment on August 19, 2003. During Fane's tenure, four other paralegals worked for the asbestos practice group: Linda Sears, Melissa Hopper, Pamela Badger, and Christine Christian. Sears left the firm on January 31, 2003, and Christian and Badger were hired as paralegals on January 6, 2003, and March 10, 2003, respectively. All paralegals in the asbestos practice group reported to Michael Bergin, a senior partner. Fane was the only African-American paralegal in the practice group.

When Locke Reynolds hired Fane, an outside placement service negotiated her salary. Fane's starting salary was $36,000, which, although at the low end of the scale for paralegals, was significantly higher than the $27,500 she received from her prior employer. Locke Reynolds determined starting salaries based on relevant education and experience, previous salary, and litigation experience. Fane had a Bachelor of Science as well as a paralegal certificate. However, she lacked litigation experience, and Locke Reynolds envisioned that she would face a steep learning curve in her new position.

Soon after Fane began working for Locke Reynolds, the asbestos practice group paralegals divided tasks among themselves, and Fane agreed to assume responsibility for doing discovery and drafting pleadings. Fane believed

---

[1] Fane first applied for employment with the firm in 1996, but was told that she needed a four-year degree to work there. Shortly thereafter, the firm hired a white female paralegal who did not have a college degree.

her workload was greater than that of her colleagues, but payroll records suggest otherwise.[2]

During Fane's tenure, Locke Reynolds used a five point scale to evaluate its paralegals, with one point equaling an unsatisfactory rating and five reflecting superior performance. In her 2001 review, Fane received a 3.60 rating, the lowest score among the three paralegals assigned to the asbestos practice group at the time. In 2002, she received a rating of 2.85, while the group's two other paralegals were rated 4.21 and 4.69. Fane's low 2002 evaluation score related, in part, to an April 2002 incident in which a firm client complained to Bergin that Fane had addressed two of its staff in an arrogant and improper tone. In response to this complaint, Locke Reynolds assigned an attorney to supervise Fane closely to avoid further client relations problems. Fane's 2002 performance evaluation also contained the following comments from evaluating attorneys:

> We have also had some problems with the 'tone' of oral and written communications to a couple of clients. Marcella, no doubt, was attempting a businesslike or professional tone which the client felt was hostile or rude. (Comment submitted by Michael Bergin.)

> Communication skills may be a matter of style, but Marcella can be unintentionally blunt to the point of appearing either rude or condescending. An awareness

---

[2] From July 1 to December 31, 2001, paralegal overtime hours were as follows: Melissa Hopper worked 86.7 hours, Linda Sears worked 41.0 hours, and Marcella Fane worked 30.5 hours. During 2002, Melissa Hopper worked 353.8 hours, Marcella Fane worked 89.2 hours, and Linda Sears worked 29.0 hours. From January 1 to August 31, 2003 Melissa Hopper worked 178.5 hours, Christine Christian worked 170.2 hours, Marcella Fane worked 17.0 hours, and Pamela Badger worked 5.0 hours.

of appearances should foster improvement. (Comment submitted by Karl Koons.)

Fane disagreed with the comments, telling the firm's paralegal liaison that she "did not understand how one could misconstrue oral and written communication[s] that were businesslike or professional in any other manner than being appropriate."

Around May 2003, the asbestos practice group met to discuss file reorganization and the processing and completion of pending discovery work. At the meeting, Bergin added some tasks to Fane's file reorganization project, and Fane stated that the additional work would require more people. At Bergin's suggestion, the four asbestos group paralegals (Fane, Hopper, Christian and Badger) divided the extra work among themselves. A few days later, Bergin spoke with Fane about having Badger assist with discovery responses, and Fane suggested that Badger and Christian help with the task. Soon after, Fane assigned Badger and Christian four cases each, keeping twelve for herself.

On August 14, 2003, one month after assigning the discovery responses to Badger and Christian, Fane sent them an e-mail inquiring about the status of the responses. Christian responded by e-mail, saying, "I have one draft done that [a supervising attorney] approved—he told me to work on the others when I could fit them into my schedule. I have been working on a National Starch production project that had to come first."

Fane replied by e-mail to both Christian and Badger, saying, "National Starch may come first, but it takes no one a whole month to draft 4 discovery responses. When will you have the remaining 3 complete? Thanks." Badger responded with an email letting Fane know that if she had a problem, she should, "try to be less rude about it!"

After receiving a copy of Fane's second e-mail, Bergin went to Fane's office to discuss how she was speaking to her co-workers. Fane directed Bergin to come in, have a seat, and shut the door. Fane did not think it was inappropriate to address a senior partner in this fashion. Bergin told Fane that her first e-mail was acceptable, but the second was inappropriate, that the recipients were upset, and that he, too, was offended by the message. Fane disagreed, telling Bergin that her communication was direct but not rude. She would not acknowledge that her second e-mail could be perceived as aggressive, rude, or offensive.

After Bergin left her office, Fane went into Christian's office, shut the door, and told Christian that her e-mails were not intended to be rude or to make Christian feel that Fane was trying to be her boss. Fane also went to see Badger, but Badger was not in her office.

Bergin concluded that he could no longer tolerate Fane's communication style and the disruption it was causing with staff members. The following Monday, the paralegal liaison met with Fane and asked for her side of the story. Again, Fane said that her communications to Christian, Badger, and Bergin were not improper, rude, insubordinate, or offensive. On August 19, 2003, Locke Reynolds terminated Fane's employment, citing her conduct toward her colleagues and insubordination toward Bergin.

On October 15, 2003, Fane filed a charge of discrimination with the EEOC, alleging that she was terminated on the basis of race. Fane did not specifically charge discrimination related to salary or workload, although she mentioned those issues in her EEOC questionnaire. On June 4, 2004, after the EEOC concluded its investigation, Fane filed her complaint in the district court, alleging that Locke Reynolds violated Title VII and § 1981 by discriminating against her in relation to workload, pay,

and termination. The district court granted summary judgment in favor of Locke Reynolds, and Fane appeals.

## II. DISCUSSION

This Court reviews a district court's grant of summary judgment de novo. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885 (7th Cir. 2001). In deciding the appeal, we make all reasonable factual inferences in favor of Fane, and will uphold summary judgment only if there is no genuine issue of material fact and Locke Reynolds is entitled to judgment as a matter of law. *Id. See also* Fed. R. Civ. P. 56(c).

Fane proceeds under the indirect, burden-shifting method articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The *McDonnell Douglas* approach requires that a plaintiff first establish certain prima facie elements suggesting race discrimination. To successfully set forth a prima facie case of racial discrimination, Fane must show that: 1) she is a member of a protected class; 2) she was meeting her employer's legitimate performance expectations; 3) she suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). We generally have applied the same prima facie requirements to both Title VII and § 1981 discrimination claims. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007).

If Fane succeeds in establishing a prima facie case, the burden of production shifts to Locke Reynolds to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id.* If Locke Reynolds meets this burden, Fane must demonstrate that the firm's pur-

ported reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. *Id.* at 143. "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

## A. Unequal Pay and Workload Claims

The district court held that Fane's workload and pay claims were barred because they were not set forth in her EEOC charge. *See Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (noting that claims must generally be set forth in an EEOC charge to give notice to the party charged with discrimination, to permit the agency to investigate the charge, and to facilitate a resolution if possible). Whether Fane exhausted her Title VII claims is immaterial, however, because Fane also sued under § 1981, which does not require a plaintiff to bring an EEOC charge before filing a claim in federal court. *See, e.g.*, *Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003). Accordingly, Fane can proceed with her unequal pay and workload claims under § 1981.

On the merits, Fane's workload claim fails for two reasons. First, she has not produced any evidence from which a jury reasonably could conclude that her workload was heavier than that of other paralegals in the asbestos practice group. Instead, Fane emphasizes her subjective belief that she worked more than other paralegals, which is not enough to survive summary judgment. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996). Indeed, Fane's belief is belied by the firm's overtime records.

Second, even if Fane had direct evidence of a heavier workload, harder work assignments do not constitute

an adverse employment action. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (noting that plaintiff's claim that he was given harder work assignments failed to "show some quantitative or qualitative change in the terms or conditions of his employment that [was] more than a mere subjective preference"). Absent any evidence suggesting that discrimination motivated work distributions, the mere fact that an employee (particularly one eligible for overtime pay) had a heavier workload than her co-workers does not amount to an adverse employment action.

With regard to her unequal pay claim, Fane has offered no evidence that Locke Reynolds's explanation of her lower starting salary and lower raises relative to other employees was pretextual. Locke Reynolds, in justifying Fane's starting pay, explained that it based employees' starting salaries on previous salaries and work experience. Indeed, Fane's $36,000 starting salary was 31% higher than her previous salary, which Fane does not dispute. By contrast, Badger, who had a significantly higher starting salary than Fane, was earning $45,000 a year at her previous job. Locke Reynolds also points to Fane's lack of litigation experience as justifying the lower starting salary, highlighting significant experiential differences among Fane, Badger, and Christian. Other than a general assertion that her experience and education equaled or exceeded that of her colleagues, Fane offers no evidence from which a jury could conclude that Locke Reynolds's cited reasons for the pay differentials were pretextual.

Likewise, Fane has produced no evidence suggesting that Locke Reynolds's stated reasons for giving her smaller raises than her colleagues were pretextual. Fane did receive pay increases throughout her employment, and Locke Reynolds cites her low evaluation scores as a legitimate reason for the disparity compared to her higher scoring co-workers. Fane asserts that the evaluators

were "more forgiving in their evaluation of other para-legals," but her assertion alone cannot create a genuine issue of material fact sufficient to survive summary judgment. *Mills,* 83 F.3d at 841-42.

## B. Termination Claim

Fane next claims that material factual issues preclude summary judgment on her claim that she was terminated because of race. The parties agree that Fane is a member of a protected class and suffered an adverse employment action. They disagree about whether she was meeting the firm's legitimate expectations and whether she has identified similarly situated individuals.

### 1. Legitimate Expectations

Fane argues that she was meeting Locke Reynolds's legitimate expectations. She notes that she completed her assignments and, prior to the incident culminating in her termination, received no disciplinary warnings other than the comments in her 2002 annual performance evaluation. She also points to her pay increases (based, at least in part, on merit) as evidence that she was meeting her employer's expectations. In response, Locke Reynolds cites Fane's low evaluation scores as well as the two incidents of interpersonal conflicts to show that she was not meeting the firm's expectations.

Fane's evidence is insufficient to demonstrate she was meeting the firm's legitimate expectations.[3] The client's

---

[3] Fane also contends that her lack of notice about her abrasiveness and insubordination somehow affects whether she was meeting the firm's expectations. Whether Fane had notice of

(continued...)

complaint about Fane's communication style coupled with the abrasive e-mail she sent to her co-workers demonstrate that she was not behaving in the manner Locke Reynolds expected. Fane's failure to live up to the firm's expectations was amplified by her inability to evaluate her own behavior, including the manner in which she addressed a senior partner. The fact that Fane completed her assignments has no bearing on whether she met Locke Reynolds's expectations regarding employee conduct. *See Herron v. Daimler-Chrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (holding that plaintiff who performed some aspects of his job well, but had a confrontational and disrespectful attitude, could not show that he was meeting his employer's legitimate expectations).

### 2.  Similarly Situated Individuals

Fane identifies two white employees that she claims were similarly situated and better treated: Donna West, a paralegal in the asbestos practice group, and Melissa Hopper, a secretary for the asbestos practice group. An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002).

---

[3] (...continued)
her transgressions, whether termination was an extreme response to them, and whether Locke Reynolds followed its own progressive disciplinary procedures are irrelevant to the issue of whether Fane was meeting the firm's legitimate expectations. We address these arguments further in our discussion of pretext.

Fane argues that she and West were similarly situated because both paralegals and legal secretaries were "non-exempt" employees eligible for the same benefits and both reported to the Director of Human Resources for work assignments, transfers, and disciplinary problems. Locke Reynolds responds that Fane reported directly to Bergin—not the Director of Human Resources.[4] Moreover, the firm contends, the employee handbook identifies five categories of employees in detail, distinguishing paralegals from support staff employees, which includes secretaries.

Although Fane identifies several examples of West behaving inappropriately towards her co-workers, Fane has failed to demonstrate that she and West are similarly situated. They perform different jobs altogether and report to different supervisors. Moreover, Fane's job involved significant client contact while the record is unclear on the extent of West's contact with clients, if any.

Hopper, unlike West, reported to the same direct supervisor as Fane and performed the same job functions. Nonetheless, Fane has failed to identify behavior on Hopper's part sufficient to satisfy the fourth *McDonnell Douglas* prong. Fane notes that Hopper's 2002 annual performance evaluation contained a comment that "Melissa seems irritated by clarifying questions," and her November 2003 evaluation stated that Hopper had "conflicts with past staff." These two vague comments, without more, do not demonstrate that Hopper's behavior

---

[4] The handbook states that the Director of Human Resources has general supervisory authority for all support personnel, but "[i]n the case of paralegals, the paralegal supervisor or the lawyer from who the paralegal receives the majority of his/her work may be the individual who has discussion with a paralegal regarding work performance problems."

was as severe as Fane's, particularly absent evidence of client complaints or Hopper failing to appreciate the wrongfulness of her conduct.

### 3. Pretext Analysis

Even if Fane could establish a prima facie case of discrimination, she has failed to provide evidence from which a jury reasonably could conclude that the firm's proffered reasons for terminating her were pretextual. To show pretext, Fane must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that Locke Reynolds did not act for the asserted non-discriminatory reasons. *Reeves,* 530 U.S. 133 at 143. If Locke Reynolds honestly believed the reasons it gave, Fane loses even if the reasons are foolish, trivial or baseless. *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

Fane argues that Locke Reynolds's reasons for terminating her—rude behavior, insubordination, and not recognizing her own inappropriate behavior—were inconsistent and in violation of the firm's own progressive discipline procedures. It is difficult to see how these three reasons are inconsistent, given that they all could describe the August 2003 e-mail incident. Additionally, Locke Reynolds could have relied on all three reasons simultaneously, regardless of whether it emphasized one over the others at a given time.

Moreover, no reasonable jury could conclude that the firm's failure to follow progressive discipline procedures

suggested discrimination. Fane offers no evidence that the progressive discipline policy was rigorously enforced, and the policy warns that "some situations may be so serious as to warrant immediate discharge. The firm shall be the sole judge of the seriousness of any situation. The firm reserves the right to terminate any employment relationship at any time, with or without cause." *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 828 (7th Cir. 2006) (finding no evidence of pretext where employer's progressive discipline policy permitted discharge for certain first time offenses). Essentially, Fane's progressive discipline argument is a claim that her employer overreacted to her behavior—not that the firm fired her under false pretenses. Accordingly, we affirm the district court's ruling.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Locke Reynolds.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*