**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

STEVEN P. JACKSON,

      Plaintiff - Appellant,

v.

NTMEDIA, LLC., a Delaware
corporation, dba Westword,

      Defendant - Appellee.

No. 05-1100
(Colorado)
(D. Ct. No. 02-CV-1259-PSF-BNB)

---

**ORDER**

Filed April 24, 2007

---

Before **O'BRIEN, EBEL** and **TYMKOVICH**, Circuit Judges.

---

      This matter is before the court, *sua sponte*, to recall the mandate issued originally

on August 23, 2006 and to issue an amended decision. The amended Order & Judgment

is reissued *nunc pro tunc* to August 1, 2006. A copy of the amended decision is attached

to this order, and shall replace the previous Order & Judgment. The mandate shall reissue

forthwith.

                                    Entered for the Court


                                    ELISABETH A. SHUMAKER
                                    Clerk of Court

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 1, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

STEVEN P. JACKSON,

      Plaintiff - Appellant,

v.

NTMEDIA, LLC., a Delaware
corporation, dba Westword,

      Defendant - Appellee.

No. 05-1100
(Colorado)
(D.Ct. No. 02-cv-1259-PSF-BNB)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **O'BRIEN**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

_____

In September 2001, Steve Jackson's employment with <u>Westword</u>, a weekly

newspaper published in Denver, Colorado, was terminated due to a reduction in

force (RIF). He filed an age discrimination claim against his employer, NTMedia

(NT), <u>Westword</u>'s corporate owner. Prior to trial, the district court granted a

motion in limine to exclude one of Jackson's witnesses, a former editor at NT's

Phoenix, Arizona, publication, concluding the testimony was irrelevant or, in the

_____

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

alternative, any relevance was outweighed by its possible prejudicial effect or its potential to confuse the jury. At the close of Jackson's evidence at trial, the court granted NT's Motion for Judgment as a Matter of Law pursuant to Rule 50(a) of the Federal Rules of Criminal Procedure. Specifically, it ruled Jackson failed to present sufficient evidence to support a conclusion that age was a determinative factor in his termination. On appeal, Jackson claims the district court erred in excluding his most important witness and in removing his claims from the jury's consideration. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

I.    Background

Jackson began working for NT's Westword in 1993. During his tenure he was supervised by Patricia Calhoun, founder of Westword.[1] While it is undisputed Jackson was an accomplished writer, he often failed to meet deadlines. On September 27, 2001, Calhoun and Andy Van de Voorde (corporate executive associate editor) met with Jackson to inform him that his position was being eliminated due to a company-wide downsizing. At that time, Jackson was forty-six years old and the oldest full-time feature writer at Westword.[2] No reason was given for his selection as part of the RIF at that time, nor did he ask for one. He

_____

[1] Calhoun founded Westword in 1977 and in 1983, sold it to NT while she remained on as an editor.

[2] The feature writers who could have been selected from the Westword staff for inclusion in the RIF and their corresponding ages were: S.J. (age 46), A.P. (age 45), S.S. (age 41), E.D. (part-time) (age 40), H.F. (age 39), D.H. (age 30), J.H. (age 29), T.W. (age 28) and J.J. (age 26).

was not offered a transfer or other accommodation as an alternative to being laid off.

At the time of Jackson's termination, NT owned thirteen newspapers nationally, having branched out from its original Phoenix-based operations. NT was founded by Mike Lacey, head of the editorial staff and based in the Phoenix publication offices, and Jim Larkin, head of the business operations. Next in NT's editorial corporate hierarchy were Christine Brennan (executive managing editor) and Andy Van de Voorde, both based in Westword's Denver office.

Prior to the RIF, NT had made several economic adjustments to address its depressed revenues, such as budget cuts and a wage freeze in the spring of 2001. Some time shortly before mid-September 2001, NT determined it would reduce the number of feature stories in its newspapers from two to one per issue. As a result, fewer feature writers were necessary. Lacey designated the task of eliminating unnecessary feature writer positions to Brennan, who calculated the number of positions to be eliminated at each of NT's papers due to the changed format. Brennan then notified each of the local editors the number of feature writers to be reduced from the staff.

On September 21, 2001, Calhoun attended a conference at which Lacey was a scheduled speaker. While there, Lacey told Calhoun that there might be layoffs in Denver and instructed her to contact Brennan when she returned to Denver. At trial, Calhoun testified she did not speak with Lacey regarding the downsizing

further. Rather, on September 24, she spoke with Brennan who informed her Westword must eliminate two positions. Calhoun testified she alone determined Jackson and twenty-eight year old T.W. would be laid off.[3] Thereafter, Brennan told Calhoun she needed to further reduce staff, resulting in Calhoun's decision to eliminate the part-time feature writing position of E.D. (age 40) while he continued in his part-time position of sports writer.

Almost immediately after Calhoun terminated T.W.'s employment, the editor at NT's Kansas publication asked T.W. if he would like to fill an open position there. T.W. accepted. Calhoun had no knowledge of the offer at the time she determined Witcher would be included in the RIF.

In December 2001, Brennan informed Calhoun an additional position needed to be eliminated. In response, Calhoun terminated full-time feature writer, J.H., (age 29). J.H. had formerly worked at NT's Phoenix paper but in April 2001, had requested a transfer to Westword to fill an open position. Because J.H. agreed to finish some stories in Phoenix, he did not actually begin working in the Denver offices until August 2001 and had not submitted his first feature story to Westword at the time of the first RIF.

Jackson filed suit against NT alleging age discrimination on July 1, 2002,

---

[3] At trial, this testimony was challenged with an affidavit Calhoun submitted earlier in the litigation indicating the decisions regarding the personnel to be laid off were made by Calhoun, Brennan and Lacey. Jackson alleges this inconsistency raises a question of fact regarding who actually made the decision to fire him and consequently, evidence of corporate behavior at any of NT's publications is relevant to his claims.

after exhausting his administrative remedies with the Equal Opportunity Employment Commission. On March 3, 2003, NT filed a motion for summary judgment. The district court denied the motion on October 21, 2003. Prior to trial, Jackson intended to offer evidence of corporate age bias through the testimony of Patty Epler, an editor of NT's Phoenix newspaper from July 1997 to April 2004. NT filed a motion in limine to prohibit Epler's testimony. The motion was denied without prejudice and the parties scheduled Epler's deposition.

On the first day of the jury trial, January 24, 2005, NT filed a supplemental motion in limine to prohibit Epler's testimony based on the information obtained at her deposition. The district court conditionally granted the motion, ruling the testimony lacked a connection to the decisions regarding Jackson and, in the alternative, held its potential for unfair prejudice outweighed its probative value. FED. R. EVID. 403. *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (discussing exclusion of evidence under Rule 403 in the employment discrimination context). However, the court ordered Jackson to submit an offer of proof in writing. Jackson did so the next day and orally moved for reconsideration. The district court denied his request. On January 27, 2005, Jackson completed his presentation of evidence. NT moved for judgement as a matter of law pursuant to Rule 50(a). The district court granted NT's motion and this timely appeal followed.

## II.    Discussion

On appeal, Jackson claims the trial court improperly made credibility determinations and weighed the evidence in NT's favor when granting the motion for judgment as a matter of law.  Jackson also maintains the trial court erred in prohibiting the testimony of his pivotal witness, Patty Epler, who was allegedly able to establish a corporate-wide age bias affecting the 2001 RIF decisions.  We address each of his claims in turn.

### A.    Judgment As a Matter of Law

We review de novo the grant of a motion for judgment as a matter of law. *Reeves v. Sanderson Plumbing*, 530 U.S. 137, 150 (1997).  We review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence. *Id*.  "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*.  In other words, we will give credence to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id*. (quotation omitted).

"Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors." *Id*. at 148.  "Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the

employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49. However, once the case is before the jury, whether a prima facie case of age discrimination was *actually* made is irrelevant except to the extent its strength bears upon the ultimate question: "whether plaintiff has produced enough [credible] evidence to persuade the trier of fact that defendant acted with discriminatory intent and that such intent caused plaintiff's injury." *Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 528 (10th Cir. 2000).

A prima facie case in an age discrimination suit involving a RIF requires the plaintiff to show: (1) he was within the protected age group, (2) he was doing satisfactory work, (3) he was discharged from his position despite the adequacy of his work, and (4) he was treated less favorably than younger employees during the RIF. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998). It is undisputed that Jackson was in the protected age group (forty or older) and was qualified for his job. The dispute centers on whether Jackson presented sufficient evidence to allow the jury to determine that NT's justification for its decision to lay-off Jackson is merely pretextual — an excuse designed to disguise NT's true intent, age discrimination.

Jackson argues the trial court usurped the jury's function by resolving material questions of fact raised by: (1) Calhoun's allegedly conflicting testimony regarding who had input regarding the individuals chosen for the RIF at

Westword; (2) evidence that, generally, a failure to meet deadlines was not a cause for termination, (3) Brennan's allegedly inconsistent testimony regarding her knowledge of the financial impetus for the RIF, and (4) evidence of preferential treatment of younger employees at Westword and NT. Jackson contends that the cumulative effect of this evidence allows a reasonable inference that Jackson's position was actually eliminated because of his age.

### (1) Calhoun's Testimony Regarding the RIF Process

Jackson contends Calhoun's pre-trial affidavit testimony regarding Brennan and Lacey's involvement in the layoff decision conflicts with her statement at trial that she alone determined the individuals to be included in the RIF. He maintains this conflict required the jury's determination regarding Brennan and Lacey's role in Jackson's termination. The portions of the affidavit at issue are as follows:

> ¶ 9. On September 21, Executive Editor Michael Lacey and I first discussed corporate layoffs. On September 24, Mr. Lacey advised me that Westword needed to eliminate two and a half writer positions from its staff.
> . . .
>
> ¶ 13. The individuals who decided which writers would be laid off were myself, age 47, Christine Brennan, Executive Manager Editor, age 48 and Michael Lacey, Executive Editor, age 54."
>
> ¶ 14. On September 25, 2001, Mr. Lacey, Ms. Brennan and I decided that T.W. and Mr. Jackson would be laid off and E.D. would move to a half-time position. We reassigned E.D. to a half time position in sports writing, eliminating his half time position as a staff writer.

(Appellant's Appx. Vol. I at 36-37.)

At trial, Calhoun testified Lacey told her the newspaper format would change causing a reduction in personnel and it was Brennan who supplied the number of positions <u>Westword</u> must eliminate. Moreover, Calhoun unequivocally testified that she alone decided which of her feature writers would be included in the RIF. Because this discrepancy lies at the heart of Jackson's claims, we reiterate the relevant trial colloquy here. The questioning regarding ¶ 9 was as follows:

Q.      Ms. Calhoun, you just said in your testimony that it was not Mr. Lacey who reported to you three days after September 21st that you needed to eliminate two-and-a-half writer positions from its staff. Isn't that what your testimony was?

A.      My testimony was he told me to talk to Christine Brennan, who was working with Mr. Lacey. So through Mr. Lacey, Christine Brennan told me how many positions I had to eliminate.

Q.      And that is not what the second sentence of paragraph 9 says, is it?

A.      It says, "Mr. Lacey advised me." He advised me through Christine Brennan.

Q.      It doesn't say that, does it?

A.      No, it says "Mr. Lacey advised me."

(Appellant's Appx. Vol. III at 579.) The questioning continued, turning to the statements in ¶¶ 13 and 14.

Q.      And the individuals who then went forward and decided who was going to be laid off were Christine Brennan and Mr.

-9-

Lacey; is that right?

A. No. I decided which individuals were going to be laid off. Christine, working with Mike Lacey, decided how many positions I need[ed] to eliminate.

Q. That differs from paragraph 13 in this affidavit, doesn't it?

A. It differs a little bit. But this is just a shorter sentence. The overall layoffs were decided by the three of us. They decided the number, and I decided the personnel.

. . .

Q. And then on September 25th, Ms. Brennan, Mr. Lacey and you decided T.W. and Mr. Jackson would be laid off, and that E.D. would move to a half-time position. Is that what happened?

A. Yes.

(*Id*. at 579-81.) By granting judgment as a matter of law, Jackson claims the trial court impermissibly resolved the "glaring inconsistency." (Appellant's Br. at 20.) Specifically, Jackson takes issue with the trial court's conclusion that the uncontradicted evidence established the decision regarding individual employees during NT's 2001 RIF was made locally, not globally, and "there was no evidence that either Lacey or Brennan directed [Calhoun] to terminate the plaintiff." (Appellant's Appx. Vol. IV at 857.)

In addressing the disparity between Calhoun's affidavit and her trial testimony, the district court stated:

The affidavit, Exhibit 64, is a bit troublesome. And perhaps it was ghost written by counsel for other purposes or perhaps [for] some other reason. But it can be explained as focusing on the ages of the three executives who made all the pertinent lay-off decisions; both the number of the positions, I guess were made by Mr. Lacey, [with] Ms.

-10-

Brennan deciding the numbers, as well as the identity of the particular individuals to be laid off . . . ., [the decision] made by the individual editors.

(*Id*. at 863-64.)

The question here is whether the trial court weighed the evidence or evaluated Calhoun's credibility to reach its decision. We conclude it did not. While the statement in the affidavit, without explanation, could be interpreted in different ways, Calhoun's trial testimony and her explanation of the affidavit's averments are not inconsistent with the evidence. But for his interpretation of the affidavit, Jackson presented no evidence at trial demonstrating Calhoun's explanation of the decision-making process was false or that she was influenced by Brennan or Lacey while she made the decision to choose Jackson's position for elimination.[4] As a result, the district court did not need to weigh evidence or

---

[4] Moreover, the record as a whole leaves no doubt Calhoun's testimony was consistent. Prior to Calhoun's affidavit, Jackson took the depositions of both Calhoun and Brennan. Each testified Brennan supplied the number of positions that had to be cut at each newspaper and each local editor chose the individual positions to be eliminated.

Perhaps most telling is Jackson's opposition to NT's motion for summary judgment — written after the affidavit was submitted. In his opposition to summary judgment, Jackson asserted as an undisputed fact:

Brennan determined how many writer positions would be eliminated, communicated to each editor how many people they would need to lay-off, and gave each individual editor the responsibility for determining which writers would be laid off at their paper.

(Appellant's Appx Vol. I at 80, ¶ 15.) Jackson fails to point to any subsequent evidence which would contradict his own statement.

determine credibility in order to credit Calhoun's testimony that she alone decided Jackson would be included in the RIF.

(2)    Pretextual Reason For Termination

Jackson argues he presented sufficient evidence that Calhoun's proffered reason for including him in the RIF, his difficulty with deadlines, was merely pretext. "The factfinder is entitled to infer from any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that the employer did not act pursuant to those reasons." *Whittington v. Nordam Group, Inc.*, 429 F.3d 986, 993 (10th Cir. 2005) (quotation omitted). "A showing that the employer's justifications for its behavior are pretextual permits a finding of intentional discrimination." *Id*. (quotation omitted).

Calhoun testified she chose Jackson to be part of the RIF because his past difficulties in meeting deadlines would pose a significant problem under the new format; "If you don't have a story coming in when you are expecting it, you have to scramble to fill the hole that emerges . . . ." (Appellant's Appx. Vol. III at 630.) At trial, Jackson conceded he missed deadlines and there were occasions when Calhoun had to find another story to publish as a replacement for his unsubmitted feature. He further admitted he had conversations with Calhoun in which she told him he had created problems for her and the paper because he failed to submit a story on time. Nonetheless, he claims the trial court weighed

evidence by ignoring his testimony that he and Calhoun had an arrangement which allowed this flexibility and testimony that all Westword writers missed deadlines. Jackson further maintains NT's failure to terminate other writers for missing deadlines is evidence that NT did not uniformly enforce its rules, "thereby raising the inference that [the employer] selectively enforced its rules against [the plaintiff] and that the rules were but a pretext to mask age discrimination." (Appellant's Br. at 24 (quotation omitted).)

While it may be true that other writers missed deadlines, Jackson fails to address uncontradicted evidence that his deadline problem was more severe than the other writers at Westword. Calhoun testified Jackson missed his deadlines "[m]ore often than not," "sometimes . . . by a day or two, and sometimes . . . by considerably more than that." (Appellant's Appx. Vol. III at 624.) Calhoun stated "[w]riters loved to miss deadline[s], [but] . . . [u]sually it is by maybe an hour, maybe a day, maybe two days in the wors[t] possible case." (*Id*. at 625.) She further testified that Jackson was the only Westword writer who missed a deadline by weeks "unless something extremely unusual came up, like an illness." (*Id*.)

While Jackson testified two other Westword writers "rarely turned in articles" and had difficulty coming up with story ideas, this testimony did not create a question of fact. He failed to present any evidence that the shortcomings of these other writers had resulted in the same type of problems he admittedly

caused by failing to miss his deadlines. Given the uncontradicted testimony that a writer's reliability became even more essential after the format change, the district court did not need to weigh evidence to conclude the jury would have no choice but to find NT presented an uncontradicted legitimate business reason for including Jackson's position in the RIF.

(3)    Brennan's Explanation of Financial Necessity for the RIF

Jackson claims Brennan's false testimony at trial regarding the financial impact on NT caused by the events on September 11, 2001, raised an inference "that the employer is dissembling to cover up a discriminatory purpose." (Appellee's Br. at 19 (quotation omitted).) He contends Brennan's trial testimony created a blanket credibility question allowing an inference that NT used the RIF to terminate older workers. Brennan's relevant testimony is as follows:

> Q:    [D]uring these reductions in force, you had Mr. Lacey's ear about who he should get rid of; is that true?
>
> A:    Mr. Lacey did not give me any input on the layoffs. He asked me to – he told me we – after September 11th, we made the decision that we would reduce our papers from a two-feature format to a one-feature format. And that meant that we had to reduce the number of staff people we had in our employ. And he gave me that assignment, and he said, "make this happen, and make it happen as quickly as possible."
>
> Q:    He told you somewhere around September 21st; right?
>
> A:    No. He told me that right after September 11th.
>
> . . .

Q:      And the criteria that you communicated to [the local editors] was
        what?

A:      I told them that because of the poor economy, because we were
        losing so many revenues, sales revenues, that we had to make the
        very difficult decision to switch from a two-feature to a one-feature
        format, and that consequently they had to reduce their staffs. And
        that was a different number for every paper. But I told them how
        many people they had to downsize.

. . .

Q:      August of 2001 would be long before you knew there would be layoffs?

A:      Well, we couldn't predict that September 11th would happen. We
        couldn't predict that our financial world would collapse.

Q.      So is it your testimony that your financial world collapsed with 9/11?

A:      Absolutely.

. . .

Q:       [W]hat other immediate effects on the newspapers did the 9/11
        tragedy cause?

A:      Well, almost immediately, the biggest impact was national
        advertising. Sales, national advertising almost instantly
        plummeted after 9/11 . . . .

Q:      What kind of decrease was there in the national ad revenue after
        9/11?

. . .

A:      I am told that national sales, national revenues at our papers
        dropped more than 50 percent.

(Appellant's Appx. Vol. IV at 688-89, 695, 702, 746-47.)

Later in her testimony, Brennan was asked about when she learned of the

September 2001 national figures. She replied that the financial officer had told

her the week before trial. The questioning continued:

-15-

Q:    So in September of 2001, when these layoff happened, you had no idea what was happening with the national sales figures, since you really didn't know anything about them?

A:    I didn't know the figures.  I only knew things were very, very bad.

Q:    So, certainly, since you were the one that is going through your – getting these budgets together, figuring out what reductions to do, you had no access to the information you just learned a week ago, did you?

A:    I had no access to the percentage.  Of course, I relied upon the CFO of the company to tell me what the state of the company was.  And he has always been honest and straightforward with me.  I had no reason to doubt him.

(*Id.* at 778.)  Jackson asserts the latter testimony conflicts with the earlier testimony regarding "what [NT] actually knew about its financial condition when it began the lay-offs," and therefore, "[t]he jury should have been allowed to decide whether Defendant took advantage of a tragedy to rid itself of older workers . . . ."  (Appellant's Br. at 5, 19.)

A careful review of the record reveals Brennan's testimony was consistent and raised no inference of pretext.  She stated she was told to reduce costs through other budgetary measures between the Spring and Fall of 2001.  In spite of those efforts, the company continued to feel a financial downturn.  She testified she was also aware that events of September 11, 2001, created increased financial pressure.  As a result of this pressure, she was told to calculate the number of personnel to be laid off at each newspaper under a new format.  There is no evidence Brennan should have known specific account information at the

-16-

time she completed the task assigned to her in September 2001. While her testimony regarding what she had been told about NT's financial information just prior to trial may have been foundationally questionable, it did not conflict with any earlier testimony or raise an inference that NT used the September 11th tragedy to lay off older employees.

      (4)     <u>Evidence of Favoritism to Younger Workers</u>

Jackson maintains he presented sufficient evidence of favoritism to younger workers in both the decisions to hire younger writers just prior to the RIF and in the decisions to transfer rather than fire younger writers after the RIF. He also claims J.H. should have been the candidate for the September 2001 RIF rather than himself.

      (a)     <u>Hiring younger writers just before the RIF</u>.

Jackson argues the trial court disregarded evidence that younger employees were hired at <u>Westword</u> and other NT newspapers shortly before the RIF, even though there was a wage freeze and a de facto hiring freeze in place throughout NT's holdings at the time. Jackson points to the hiring of J.H. (age 29) and D.H. (age 30) at <u>Westword</u> and S.B. (age 26) in Phoenix. These hires, according to Jackson, raised an inference of a plan to staff <u>Westword</u> (and other NT newspapers) with younger writers while trimming older writers from its ranks.

Jackson again ignores the uncontradicted testimony that each of these employees were hired to fill positions that had been open since late 2000 and

-17-

April 2001, long before the necessity of a RIF was known. "The fact that [NT's] managers were hiring before they learned of the RIF is irrelevant to proving that the RIF was pretextual." *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996). In addition, there is no evidence that any of these employees received a raise as a result of accepting an existing position. The law does not require employers to lay off based on seniority or to reverse transfer decisions after the need for layoffs becomes known. *Id*. Therefore, NT's decision to hire or transfer these employees at the same rate of pay prior to the RIF decision does not raise an inference of discrimination.

        (b)     Favoritism Toward J.H.

Jackson also contends the jury should have been permitted to consider whether Calhoun should have selected J.H for the September 2001 RIF because Calhoun offered contradictory testimony as to why he was not considered and there was evidence demonstrating J.H. had serious ethical issues. Calhoun testified that she did not consider J.H. for the RIF in September 2001, because he had not yet turned in his first feature story at <u>Westword</u>. In the notorious summary judgment affidavit, Calhoun stated, "Mr. Lacey, Ms. Brennan and I *later* decided that J.H. would be laid off when he completed work already in progress." (Appellant's Appx. Vol. I at 37 (emphasis added).) Once again, the affidavit does not conflict with the testimony. Indeed, it supports Calhoun's testimony that she determined J.H. should be laid-off in January because by December, she

considered him her weakest writer. Jackson presented no evidence at trial regarding J.H.'s ethical issues. Rather, the only reference to such issues is found in Jackson's deposition regarding his understanding that there were concerns. Jackson's "[s]peculation, however, will not suffice for evidence." *Doan*, 82 F.3d at 977.

Jackson's argument on this point also alludes to Epler's proffered testimony. However, Epler's deposition testimony reveals she allegedly discussed her ethical concerns about J.H. with Calhoun only *after* the September 2001 RIF. Epler also testified that at no time during her conversation with Calhoun did Calhoun state she was directed to terminate Jackson instead of Hibberd. Thus, even were we to consider this evidence, it does not support an inference of age discrimination.

(c) Transfers of Younger Writers

Jackson claims the district court erred when it did not consider the transfer of T.W. from the Denver office and employee transfers from other offices during the September 2001 time period as evidence of age discrimination for the jury's consideration. "Although an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, the employer violates the ADEA when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1988).

> In other words, a plaintiff denied an opportunity to transfer establishes a prima facie case of age discrimination when he or she produces evidence demonstrating that 1) he or she is a member of a protected class; 2) at the time of his or her termination he or she was qualified for other available positions within the corporation; 3) the employer did not offer such positions to the plaintiff; and 4) a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position . . . .

*Id*.

Not only did the uncontradicted evidence demonstrated a sound business reason for each transfer, Jackson failed to establish he was similarly situated to some of the other employees. As to T.W.'s transfer from <u>Westword</u>, Calhoun did not participate in the decision to transfer T.W., nor did she know of the possibility when she determined to eliminate his position in September 2001. It was only after Calhoun informed T.W. his position would be eliminated that the editor of the Kansas publication specifically requested that T.W. be allowed to fill an open position there.

Jackson also relies on the transfer of M.H. (age 24) from NT's newspaper in Houston, Texas, to the paper in Oakland, California. However, Jackson ignores the uncontradicted testimony that M.H. was not part of the RIF. Pursuant to a request from M.H. very early in 2001 to leave Houston, she transferred from Houston to fill an entry-level position at the Oakland paper available due to an employee's termination for cause. Similarly, B.M. (age 26) was the music editor at the Phoenix paper and was offered an opportunity to fill an open music editor position in Cleveland, Ohio. Again, his transfer is irrelevant to Jackson because

the positions are not similarly situated. *Whittington*, 429 F.3d at 999 ("[A]ge discrimination may not be inferred from different treatment of employees unless the employees are similarly situated under the circumstances and the difference in age between the employees is not insignificant.") (quotation omitted). Finally, Jackson refers to the transfer of M.F. (age 25) from the Miami, Florida, office. Jackson disregards the fact M.F. was transferred with M.E. (age 49) from the same office.

Even assuming their positions were similar to Jackson's, a fact not established at trial, it is uncontradicted that their transfer occurred because the Miami office needed to eliminate four positions, while the nearby Fort Lauderdale, Florida, paper had two open positions. Because it would not be necessary for M.F. and M.E. to relocate in order to fill those positions, the editor in Fort Lauderdale agreed to accept both, thereby allowing the Miami paper to eliminate only two positions. Given the undisputed evidence that only possibly similarly-situated employees, one over-forty and one under-forty, were transferred because of their geographical proximity to open positions, we conclude the district court did not err in ruling this evidence could not support an inference of age discrimination.

In sum, the sheer number of Jackson's allegations of error cannot substitute for their lack of substance. We agree with the district court that the reasons given for Jackson's inclusion in the RIF were "at least, plausible, if not compelling."

(Appellant's Appx. Vol. IV at 862.) The court correctly noted Jackson failed to come forward with evidence of age bias at <u>Westword</u>, he presented no evidence that Calhoun's choice was influenced by others, no evidence that <u>Westword</u> was a particularly youth-oriented workplace and no evidence that younger individuals were hired in anticipation of the RIF or were transferred based on age pursuant to some corporate policy. "[W]e will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 938 (10th Cir. 2005) (quotation omitted).

> [A]n employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves,* 530 U.S. at 148. Jackson failed to rebut NT's non-discriminatory reasons for including Jackson in the RIF – NT determined to change the format in light of financial difficulty, the new format required the elimination of positions and Jackson's position was eliminated due to his chronic failure to meet deadlines. The jury could come to but one conclusion, warranting judgment as a matter of law.

B. Admission of Testimony

The district court's ruling regarding the admission of evidence is reviewed for an abuse of discretion. *Black v. M & W Gear Co.*, 269 F.3d 1220, 1227 (10th

Cir. 2001). "We will not disturb the court's ruling unless we have a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776 (10th Cir. 1999) (quotation omitted). Jackson contends the court abused its discretion in disallowing Epler's testimony because it was relevant to show corporate-wide age-bias in a corporate-wide RIF. According to Jackson, the jury was entitled to consider what was occurring throughout the corporation, including remarks by Lacey, Brennan and Van de Voorde reflecting "a cumulative managerial [age-bias] . . . that has influenced the decisionmaking process for a considerable time." (Appellant's Br. at 26 (quotation omitted).)

Jackson claims Epler would have established a "nexus between corporate actions in Phoenix [and] corporate actions felt in Denver" because six months to a year after Jackson was laid-off, Brennan allegedly told Epler not to hire a fifty-year-old woman due to her age and they needed someone "young and hip." (Appellant's Appx. Vol. II at 272-73.) In addition, Lacey made the decision in Phoenix to include two over-forty employees in the September 2001 RIF, one who was allegedly laid off because Lacey thought the employee was "burned out." (*Id*. at 276.) Further, Epler testified regarding a number of incidents beginning in the spring of 2002 and occurring through 2004 which demonstrated a workplace culture favoring youth at the Phoenix office. While we make no comment on how

-23-

this testimony would relate to a decision made in the Phoenix office, the district court did not abuse its discretion in concluding these incidents were irrelevant to Calhoun's decision to choose Jackson in the September 2001 RIF.

"The threshold inquiry in any dispute over the admissibility of evidence is whether the evidence is relevant." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246 (10th Cir. 2000). To demonstrate a discriminatory animus, a plaintiff must show "a nexus between the allegedly discriminatory statements [and actions] and the defendant's decision to terminate the plaintiff." *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1281 (10th Cir. 2003) (quotation omitted). Comments or actions unrelated to the challenged action "are insufficient to show a discriminatory animus in termination decisions." *Id*.

Epler had no knowledge, nor is there any other evidence, that Lacey, Brennan or Van de Voorde affirmatively conveyed any alleged discriminatory animus to Calhoun, who was the Denver decision-maker of record. *See Cariglia v. Hertz Equip. Rental Corp.,* 363 F.3d 77, 85 (1st Cir. 2004) (discussing lack of taint of animus infection). Nor is there evidence that Calhoun independently harbored or demonstrated any discriminatory animus toward Jackson.

To establish pretext, any alleged animus on the part of Lacey, Brennan and Van de Voorde is relevant only if they participated in or influenced the decision to terminate Jackson. *See Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004) ("The analysis of pretext focuses only on what the decisionmaker,

and not anyone else, sincerely believed."). While the corporate supervisors could have chosen to direct Calhoun's decision, there is no evidence that they did so. Epler's testimony merely relates alleged comments articulated from months to years after Calhoun determined Jackson's position should be eliminated.[5] Despite Jackson's attempt to connect these comments to some corporate angst, Eplers's testimony forges no connection between the statements in Phoenix and decisions in Denver.

Even if Epler's testimony had slight relevance to the decision to eliminate Jackson's position, its unfair prejudice far outweighed any probative value. "Testimony about later events is even less relevant and of less probative value than evidence of prior bad acts generally, because the logical relationship between the circumstances of the character testimony and the employer's decision to terminate is attenuated." *Coletti,* 165 F.3d at 777; *see also Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1289 (10th Cir. 2000) ("Even assuming that [a manager's] comment was racially motivated, . . . it was made some three years after [the employment action] and is not probative of [his] motivations [at the time he made his decision]."). Because Epler's testimony did not establish a connection between the September 2001 decision in Phoenix and Calhoun's

_____

[5] While Epler alleged an ageist comment made by the Phoenix editor, Kristi Dempsey, prior to the September 2001 RIF, Dempsey had no part in the Phoenix or Denver decisions. Lacey made the decisions in Phoenix, the only publication at which he had a hands-on working relationship.

decision in Denver, it was irrelevant to Jackson's claims. Even if some slight relevance could be gleaned from attenuated inferences, the district court did not err in concluding the probative value of Epler's testimony was significantly outweighed by its potential prejudice.

AFFIRMED.

Entered by the Court:

**Terrence L. O'Brien**
United States Circuit Judge