NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3821
_____

MICHAEL EMMETT,
                                    Appellant

v.

KWIK LOK CORPORATION
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 11-cv-00528)
District Judge:  Honorable Eduardo C. Robreno
_____

Submitted Under Third Circuit LAR 34.1(a)
June 13, 2013

Before:  SCIRICA, HARDIMAN and ALDISERT, *Circuit Judges*.

(Filed: June 14, 2013)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

        Michael Emmett appeals the District Court's summary judgment on his age

discrimination and retaliation claims against his former employer, Kwik Lok Corporation.

 For the reasons that follow, we will affirm.

## I

Emmett was a regional sales manager for Kwik Lok, a manufacturer of plastic closures, from May 1993 until September 2009, when he was terminated at the age of 53. At all times relevant to this action, Emmett reported to Richard Zaremba, who was hired as Kwik Lok's Eastern Division Sales Manager in April 2008. Zaremba, in turn, reported to Hal Miller, the Vice President of Sales.

When Zaremba first began working for Kwik Lok, Miller instructed him to "put some pressure" on several low-performing regional sales managers, including Emmett. App. 273. Soon after, Zaremba summoned Emmett into his office and stated in the course of that meeting: "[A]t 52 years of age it's—I wouldn't want you to get bored in your work. It's hard to find a new job. There's a lot of young guys looking for work." App. 76.

Emmett viewed this comment as a threat and, in June 2008, he approached Kwik Lok's Human Resources Manager about the incident. Emmett then telephoned Miller and reported the comment to him, as well. Miller asked Emmett "[i]n a very angry and harassing tone" what he was "going to do about it." App. 95. Miller told Emmett that he "should be a man and handle it with Rich directly," and accused Emmett of "trying to build a case." *Id.*

Up until the phone conversation, Emmett had maintained a good relationship with Miller and considered him to be a "friendly coworker." App. 95–96. Miller and Emmett

2

would usually speak with each other at the company's annual sales conference, and Miller typically called Emmett at least once a year to check in with him. At the beginning of the July 2008 conference, however, Emmett's relationship with Miller began to sour, until Miller and Emmett met later that week to discuss Emmett's complaint. Emmett told Miller: "[A]s far as I'm concerned if nothing like this happens again the issue is settled." App. 99. Miller said that he "fe[lt] terrible about [the] whole thing" and "accept[ed] the responsibility for what has happened." *Id*.

About a year later, Zaremba made another comment that Emmett interpreted as age related. After a brief silence following a conversation about business, Zaremba asked Emmett: "[H]ow's your health and is your mortgage paid." App. 92. Emmett did not mention the conversation to Miller or anyone else.

Emmett's relationship with Miller once again appeared strained at the July 2009 sales conference, where Miller "spoke to [Emmett] infrequently and only then with a rigid and formal manner." App. 300. Nor had Miller called Emmett to check in with him that year.

Around that same time, one of Emmett's customer accounts, Procacci Brothers, began experiencing some problems with the service it received from Kwik Lok. In July 2009, Procacci Brothers' representative, Rita Neczypor, called Emmett to complain about technical difficulties with their new closure system, and about the fact that they had received an inexact number of closure labels in a recent shipment. The catalogue stated

3

that customers would receive 12,000 labels per carton. Instead, Procacci Brothers received cartons containing 14,800 labels because they contained larger rolls, which caused its equipment to jam.

Emmett spoke to Zaremba about the shipment problem, and Zaremba promised Neczypor that Kwik Lok would resolve the issue. Emmett and Kwik Lok offer slightly different accounts of what Zaremba told Neczypor that Kwik Lok would do in the future. Pursuant to a longstanding Kwik Lok policy, customers placing an order with Kwik Lok have two options: they can order a certain number of closures and the actual amount delivered will be within a ten percent margin of that target amount, or, if they pay a ten percent surcharge, they can receive an exact count of closures. According to Emmett, Zaremba promised Neczypor that Procacci Brothers would receive exactly 12,000 labels per carton in the future. Zaremba claims, in contrast, that he promised Neczypor that future deliveries would contain the amount of labels promised in the catalogue—that is, 12,000 labels per carton, plus or minus ten percent, or exactly 12,000 labels if Procacci Brothers opted to pay the ten percent surcharge. It is undisputed that Emmett never discussed the surcharge policy with Neczypor—either before or after their July 2009 phone conversation—although he did supply her with a price sheet that included information about the surcharge.

In August 2009, Kwik Lok shipped a carton to Procacci Brothers that did not contain exactly 12,000 closures. When Emmett learned of the shipment, he called the

4

Kwik Lok plant manager, Dale Crabill. According to Crabill, Emmett "just came unglued." Supp. App. 52. He was speaking in a "high voice" and "he was just taking me up one side, down the other and how you don't know how to run the plant, I should get somebody in there that knows how to run the plant. And just like that. And before I had a word to say, after that, he hung up." Supp. App. 52–53. Emmett claimed that he "wasn't out of control or yelling or anything like that," but acknowledged that he was "upset about it, and when I get upset you get a little bit elevated voice." App. 115. Crabill called Miller about the phone conversation and suggested that Emmett should be fired immediately. Emmett then sent an email to Zaremba, Miller, and Crabill expressing outrage over the Procacci account:

> The customer requested a consistent per carton count and we agreed to it! We need to adapt to service our customers needs and in this case the aforementioned is what we needed to satisfy the account. It would be impossible to explain to this customer, or most any others for that matter, that they should expect their order quantities to be filled with in a +/- 10% accuracy only. The +/- 10% quantity counts are not acceptable in todays marketplace. I wouldnt live with it if I was buying someones products! The 10% upcharge for accurate counts needs a serious review.

App. 193.

After receiving the email, Miller sent a letter to Emmett terminating his employment. The letter referred to Emmett's email, which it stated had been written "in a tone of disrespect" and showed a lack of knowledge about company policy. It also commented on Emmett's unwillingness to support company policy, the fact that Emmett was "constantly critical" of the company, and Emmett's lack of enthusiasm for his job.

5

App. 197–98.

Kwik Lok interviewed three candidates to replace Emmett. Ultimately, it reconfigured the territories of the other three sales representatives in the Eastern Division of the company instead of hiring a new employee. Those representatives were 37, 48, and 59 years old, respectively.

Emmett filed a complaint in the United States District Court for the Eastern District of Pennsylvania, alleging that he had suffered discrimination and retaliation, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*., and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. Ann. § 951 *et seq*. The District Court granted summary judgment in favor of Kwik Lok on all counts. Emmett filed this timely appeal.

## II[1]

Emmett claims the District Court erred in granting summary judgment for Kwik Lok on his discrimination and retaliation claims. We exercise plenary review over a district court's grant of summary judgment, applying the same standard that a district court would apply. *Burton v. Teleflex Inc.*, 707 F.3d 417, 424–25 (3d Cir. 2013). We will affirm if the moving party has established that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291.

56(a).

A

Emmett's age discrimination claims under the ADEA and the PHRA are governed

by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802–04 (1973). *See Fasold v. Justice*, 409 F.3d 178, 183–84 (3d Cir. 2005).

Under this framework, the plaintiff bears the burden of making out a prima facie case of

discrimination. *Id*. at 184. Once the plaintiff has established a prima facie case, the

burden shifts to the defendant to identify legitimate justifications for the adverse

employment action. *Id*. The burden of production then returns to the plaintiff, who must

produce evidence showing that his employer's proffered justifications are pretextual. *Id*.;

*see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). The District Court

did not err when it held that Emmett failed to produce evidence that Kwik Lok's

proffered justifications were pretextual.[2]

Kwik Lok identified several legitimate reasons for Emmett's termination,

including Emmett's temper and his treatment of his coworkers following the Procacci

---

[2] By addressing only the third *McDonnell Douglas* step, we do not imply that the District Court erred in finding that Emmett had failed to make out a prima facie case of discrimination. Indeed, we note that the evidence that Emmett did produce to show that he was terminated because of his age—one age related comment made by a non-decisionmaker, a second comment that does not clearly appear to be age related made by the same employee, and a five-year difference between Emmett and the average age of the three individuals who took over his job duties—is very thin. *See Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n.9 (3d Cir. 2000) (average age difference of five years not enough to establish a prima facie case of age discrimination).

Brothers incident, his failure to support company policy, and his consistently poor performance. Thus, Emmett had to present evidence that would allow a factfinder to reasonably conclude that the reasons offered by Kwik Lok were fabricated, or to otherwise find that Miller had fired Emmett for discriminatory reasons. *See Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).

To cast doubt on a company's proffered reasons for an adverse employment action, it is not enough to show that the company's decision was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id*. at 765. Instead, Emmett was required to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence," *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765) (internal quotation marks omitted), and could thus "infer . . . that the employer engaged in the adverse employment action for an invidious reason," *id*. (citing *Fuentes*, 32 F.3d at 764).

Emmett identifies two factual disputes that, he claims, could cast doubt on Kwik Lok's proffered justifications. First, he admits that he raised his voice at Crabill, but claims that he was not—as Crabill suggests—"out of control screaming and yelling." App. 115. While Emmett may characterize his conversation with Crabill differently than Crabill does, he offers no reason to doubt that Crabill was upset after the conversation or

8

that Crabill reported the incident to Emmett's supervisors. Indeed, Emmett acknowledges that, after the incident, Zaremba asked him to call Crabill and "kind of smooth things over." App. 116. Thus, Emmett provides no reason to doubt that, at the time Miller made the decision to terminate his employment, Miller believed that Emmett had spoken to Crabill in an unprofessional manner. *See Fuentes*, 32 F.3d at 766–67.

Second, Emmett claims that it is disputed whether Zaremba and Crabill were at fault for the problems he had with the Procacci Brothers account. Emmett claims Zaremba promised Neczypor that her company would receive an exact count of closures in the future, and Zaremba claims he did not. Thus, although the origin of Emmett's problems with the Procacci Brothers account may be disputed, this disagreement is irrelevant to the question of whether Emmett behaved properly *after* the problems with the account arose. Emmett acknowledges that he never expressly told Neczypor about the surcharge for an accurate count; he does not dispute that he criticized company policy; and he admits that he raised his voice at his colleague following the incident. Even if Emmett could show that Zaremba did promise an exact count of closures, and that Crabill failed to deliver them, this would not cast doubt on Kwik Lok's proffered justifications for Emmett's termination.

Emmett further argues that the jury could infer that he was fired for discriminatory reasons from the fact that Kwik Lok did not follow the progressive discipline policy suggested in its handbook. Emmett has not, however, produced evidence that this

9

disciplinary policy was mandatory or rigorously followed, so little can be inferred from the company's decision not to adhere to the policy in this instance. *See Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th Cir. 2008) (non-mandatory nature of company's progressive discipline policy "negate[s] its persuasiveness in showing pretext"); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007); *see also Smith*, 589 F.3d at 692 (noting that plaintiff failed to introduce evidence of a mandatory progressive discipline policy).

The reasons given by Kwik Lok for Emmett's termination—insubordination, refusal to support company policy, and poor work performance—are consistent, legitimate explanations for Kwik Lok's decision. Emmett has not produced evidence that would cast doubt on those reasons or that might otherwise show that Miller acted with discriminatory intent. Although Emmett claims his direct supervisor, Zaremba, made a reference to his age at a meeting conducted in the summer of 2008, it was Miller who ultimately made the decision to terminate him, and "[s]tray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *See Fuentes*, 32 F.3d at 767 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)). Thus, the District Court did not err when it held that Emmett had failed to produce evidence showing that the legitimate reasons given by Kwik Lok for his termination were pretextual.

B

Emmett's retaliation claim under the ADEA and PHRA is likewise governed by the *McDonnell Douglas* framework. *See Fasold*, 409 F.3d at 188. To establish a prima facie case of retaliation under either statute, Emmett was required to show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). The District Court correctly held that Emmett failed to produce evidence showing a causal connection between his age discrimination complaint, made in the summer of 2008, and his termination, which did not occur until fifteen months later.

A causal connection may be established by showing "an unusually suggestive temporal proximity" between the protected conduct and the adverse action or "a pattern of antagonism coupled with timing." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The fifteen-month gap between Emmett's report and his termination is not "unusually suggestive," and Emmett has not presented evidence showing a pattern of antagonism. Although Emmett claims that Miller's initial response to his complaint was hostile, this conversation occurred more than a year before Emmett's termination, and Emmett has not identified evidence showing that this antagonism

11

continued over the course of the next year. Emmett's testimony and affidavit suggest only that Miller was less friendly to him than normal at the beginning of the 2008 sales conference, friendly at the end of the conference, and again cold toward him at the 2009 sales conference, and that Miller failed to check in with him by telephone that year.

Nor does other evidence of record give rise to an inference that Emmett was fired in retaliation for his complaint. Emmett claims that after he reported Zaremba's comment to Human Resources, Miller instructed his staff to conduct an investigation into his sales call volume. Miller testified during his deposition, however, that he frequently asked for these kinds of reports on Emmett and other employees, and Emmett presented no evidence to contradict this claim. Moreover, even if Kwik Lok chose to document Emmett's poor work performance because it was concerned that Emmett might bring a lawsuit against the company in the future, its decision to protect itself does not show retaliatory animus. *Fuentes*, 32 F.3d at 766 (explaining that documentation to protect against a lawsuit can often "only be described as displaying business acumen"). The District Court thus did not err in entering judgment against Emmett on his claims for retaliation.

## III

For the foregoing reasons, we will affirm.